✓ Priority
✓ Send
___ Clsd
✓ Enter
___ JS-5/JS-6
___ JS-2/JS-3

FILED
CLERK, U.S. DISTRICT COURT

OCT 3 0 2001

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT

OCT 3 1 2001
2001

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ECONNECT, INC. SECURITIES LITIGATION | ) CASE NO. CV 00-2674 MMM (JWJx) |
| | ) |
| | ) ORDER RE PLAINTIFFS' MOTION FOR |
| | ) FINAL APPROVAL OF SETTLEMENT |
| | ) AGREEMENT AND PLAN OF |
| | ) ALLOCATION AND  APPLICATION OF |
| | ) PLAINTIFFS' COUNSEL FOR AWARD |
| | ) OF ATTORNEYS' FEES AND |
| | ) REIMBURSEMENT OF EXPENSES |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

Plaintiffs have moved, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for final approval of a proposed settlement of the claims asserted in this securities fraud litigation. Their counsel have moved for an award of attorneys' fees and costs.  The terms of the settlement are set forth in a Class Action Stipulation of Settlement ("the Settlement Agreement") dated June 4, 2001.

The Settlement Agreement provides that  eConnect, Inc. will deposit $350,000 cash into an interest-bearing account, and issue stock warrants valued at $2.5 million (the "Settlement Fund").  The Settlement Fund is to be distributed fully to all class members submitting claims following the deduction of attorneys fees' and costs.  It is anticipated that the cash portion of the

✓ Docketed
✓ Copies / NTC Sent
___ JS - 5 / JS - 6
___ JS - 2 / JS - 3
___ CLSD

1   settlement will be used to pay the costs of notice and administration, and to reimburse counsels'

2   litigation expenses.   Thus, class members' claims and attorneys' fees will be paid from the

3   warrants portion of the Settlement Fund.  Notice of the settlement was sent to class members by

4   first class mail.  The notice included a disclosure that class counsel would seek attorneys' fees of

5   twenty-five (25) percent of the warrant portion of the Settlement Fund, plus reimbursement of

6   expenses.  No valid objections have been received, although sixty class members seek to opt-out

7   of the settlement class.

8        To have succeeded on the merits of their securities fraud claims at trial, plaintiffs would

9   have had to prove that defendants made materially false representations or omissions in connection

10  with the purchase or sale of securities, that defendants knew the statements were false or acted

11  in reckless disregard of their truth, that plaintiffs justifiably relied on the misrepresentations or

12  omissions, and that they were the proximate cause of plaintiffs' damages.  For reasons discussed

13  *infra*, proof of scienter and causation would have been particularly problematic in this case.

14  EConnect has no liability insurance covering plaintiffs' claims, and limited financial resources

15  generally.  It is thus questionable whether it would survive extended litigation or be able to satisfy

16  any significant damages award.  The individual defendants' assets are likewise limited.  This fact

17  and the problems of proof that plaintiffs would have encountered make the proposed $2.85 million

18  settlement reasonable.

19       Plaintiffs' counsel also seek attorneys' fees of twenty-five percent of the warrant portion

20  of the Settlement Fund, plus reimbursement of approximately $140,000 in costs.  The court

21  approves attorneys fees of 20% of the warrant portion of the settlement fund.  The difference in

22  award from the amount requested results from the court's lower estimation of the effective hours

23  devoted to the case by counsel.  The court further approves $133,709.43 of counsels' expense

24  reimbursement request, having deducted certain non-allowable expenses and items as to which

25  insufficient information was provided.

26

27                          **I. FACTUAL BACKGROUND**

28       EConnect is a Nevada corporation with its principal executive offices in San Pedro,

California.[1] EConnect develops technologies, products and services for use in electronic commerce, specifically hardware and software systems designed to enable online remote, credit and ATM card transactions, such as those used in online gambling.[2]

Plaintiffs allege that in its Form 10-QSB filed November 18, 1999, eConnect listed total assets of $44,646 and expressed doubts regarding its continuing viability.[3] To remain in business, the company embarked on a program of using stock to purchase existing businesses.[4] This program, and eConnect's survival during the Class Period were allegedly dependent on maintaining a high stock price, as stock was the company's only asset and its only means of growing through acquisition.[5] To inflate the stock price, plaintiffs contend that eConnect issued a series of materially false public statements between November 18, 1999 and March 3, 2000.[6]

On March 13, 2000, the SEC temporarily suspended trading in the company's shares "because of questions . . . about the adequacy and accuracy of [publicly] disseminated information" regarding its transactions with other companies.[7] On March 23, 2000, the SEC announced that it had filed charges against eConnect and its president, Thomas Hughes, for issuing false statements regarding various joint venture or other business arrangements.[8] Plaintiffs allege that, as a result of the allegedly false statements, eConnect's stock price rose from approximately $1 per share at closing on February 22, 2000, to a high of $21 a share on March

---

[1]Plaintiffs' Consolidated Amended Class Action Complaint, ¶ 11.

[2]*Id.*, ¶ 32.

[3]*Id.*, ¶ 34-35.

[4]*Id.*, ¶ 36 .

[5]*Id.*, ¶ 42.

[6]*Id.*, ¶¶ 37-61.

[7]*Id.*, ¶ 64.

[8]*Id.*, ¶ 65.

9, 2000.  Although the stock fell to $10 per share on March 10, 2000,[9] plaintiffs maintain that it continued to trade at an artificially high level until the SEC suspended trading on March 13, 2000.  When trading resumed on March 27, 2000, the stock price fell precipitiously to $.25 a share.

On March 14, 2000, the first of thirty-one shareholder actions ultimately consolidated by the court was filed.  Consolidation was ordered on July 17, 2000, and lead plaintiffs and lead counsel were appointed.[10]  Settlement discussions commenced in the summer of 2000, and concluded with execution of a memorandum of understanding on November 1, 2000.  Pursuant to the terms of the memorandum of understanding, defendants agreed to establish a cash fund of $350,000 and issue warrants for five million shares of eConnect common stock valued at $2.5 million.[11]  Plaintiffs' damages and materiality expert has estimated that the settlement class sustained damages of approximately $15 million.[12]  The Settlement Fund thus represents 19% of the estimated damages.

## II. DISCUSSION

### A.   Notice Requirements

Rule 23(e) requires that "notice of the proposed dismissal or compromise [of a class action] shall be given to all members of the class in such manner as the court directs."  The notice given must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v.*

---

[9]*Id.*, ¶ 67.

[10]Stipulation of Settlement at 1:11-15.

[11]Declaration of Laurence D. King in Support of Plaintiff's Application For: (1) Final Approval of Settlement; (2) Approval of Plaintiff's Plan of Allocation for the Net Settlement Fund; and (3) An Award of Attorneys' Fees and Reimbursement of Expenses("King Decl."), ¶ 22.

[12]Supplemental Joint Declaration of Laurence D. King and Vahn Alexander in Response to Court's Order of September 14, 2001 ("King & Alexander Decl."), Ex. 2; Supplemental Declaration of Plaintiffs' Damages and Materiality Consultant Jane D. Nettesheim ("Supp. Nettesheim Decl."), ¶ 15.

4

1   *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); see also *Mandujano v. Basic*

2   *Vegetable Products, Inc.*, 541 F.2d 832, 835 (9th Cir. 1976) ("To comply with the spirit of [Rule

3   23(e)], it is necessary that the notice be given in a form and manner that does not systematically

4   leave an identifiable group without notice").

5          Plaintiffs' counsel published notice of the settlement and the fairness hearing as directed

6   by the court in its June 14, 2001 order.  Specifically, they published a summary notice, advising

7   interested parties how they might obtain a complete copy of the Notice and claims information,

8   in the July 6, 2001 national edition of *Investor's Business Daily*.[13]  In addition, they mailed more

9   than 71,000 copies of a Notice of Proposed Settlement to class members, brokerage firms,

10  trustees, nominees, and others.[14]  Both the mailed and published notices advised class members

11  of the date, time, and location of the fairness hearing in this court, and indicated that the deadline

12  for submitting requests for exclusion and/or objections to the proposed settlement was August 27,

13  2001.

14         As respects the adequacy of efforts to mail notice of the proposed settlement to class

15  members, plaintiffs proffer the declaration of Michael Rosenbaum, a partner in David Berdon &

16  Co., the firm hired to mail notice to all persons or entities who purchase or acquired eConnect

17  securities during the class period.  Rosenbaum offers his opinion, based on experience, that two

18  weeks "would have been sufficient advance time for a Notice . . . mailed to Class members to

19  have afforded them sufficient opportunity to object to, or exclude themselves from participating

20  in, the Settlement."[15] As the notice stated that objections and/or requests for exclusion had to be

21  received by August 27, Rosenbaum states that notices mailed by August 13, 2001 should have

22  been adequate.

---

24   [13]*Id.*

25   [14]Declaration of Michael Rosenbaum Re: Mailing of Notice of Pendency of Proposed Class
26   Action ("Rosenbaum Decl."), ¶ 6.

27   [15]Supplemental Declaration of Michael Rosenbaum ("Supp. Rosenbaum Decl."), ¶ 3.
     Rosenbaum notes, in this regard, that class members utilize e-mail, facsimile, and overnight mail,
28   in addition to regular mail, to register objections and/or request exclusion from the class.

Between June 29 and August 13, 2001, Berdon mailed 34,951 notices directly to class members.[16] Another 26,520 notices were sent to class members after August 13, 2001.[17] Of these, 14,259 notices were mailed to class members whose addresses were received prior to August 13, but not in sufficient time to mail by that date.[18] An additional 8,846 were sent in response to requests received from brokers and attorneys after August 13.[19] Finally, 3,692 notices were sent to brokers and/or law firms who requested additional copies after August 13, 2001.[20]

The court's role in the present matter is to represent those class members who were not a party to the settlement negotiations and agreement. See *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F.Supp.2d 1021, 1027 (N.D. Cal. 1999) ("The purpose of Rule 23(e) is to protect 'unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are unable to secure satisfaction of the individual claims by a compromise,'" quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Part of this role is ensuring that all class members receive adequate notice of the proposed settlement. The delay in notifying a substantial number of class members raises questions in this regard. Plaintiffs note that no class member's objection or request for exclusion has been rejected on the basis that it is untimely. There remains the possibility, however, that certain class members simply did not respond because they believed that the deadline for objection and/or exclusion had passed.

In circumstances similar to these, the Ninth Circuit has nonetheless held that notice was sufficient. In *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993), cert. denied, 512 U.S. 1220 (1994), 76,700 notices were mailed to shareholders who held shares of the defendant

---

[16]Supp. Rosenbaum Decl., ¶ 6.

[17]King & Alexander Decl. at 3:14-15.

[18]*Id.*, ¶ 6.

[19]Supp. Rosenbaum Decl., ¶ 7.

[20]*Id.*, ¶ 5.

1   company in their own names. This mailing was completed approximately one month before the

2   deadline set for objections or requests for exclusion. *Id.* Simultaneously, notice was sent to 277

3   brokerages, banks, and institutions holding shares in their street names for beneficial owners. The

4   institutions responded by submitting an additional 36,000 shareholder names and addresses.

5   Notice was mailed to these shareholders after the deadline for filing objections or requests for

6   exclusion had passed. *Id.* at 1374. The court held that notice was sufficient, noting that

7       "the question before us today is not whether some individual shareholders got

8       notice, but whether the class as a whole had notice adequate to flush out whatever

9       objections might reasonably be raised to the settlement.   If an individual

10      shareholder later claims he did not receive adequate notice and therefore should not

11      be bound by the settlement, he can litigate that issue on an individual basis. . . ."

12      *Id.* at 1375.

13  See also *White v. National Football League*, 41 F.3d 402, 408 (8th Cir. 1994) (holding that notice

14  mailed "approximately one month prior to the first settlement hearing" was adequate notice), cert.

15  denied, 512 U.S. 1220 (1995), abrogated on other grounds in *Amchem Products, Inc. v. Windsor*,

16  521 U.S. 591 (1997); *Armstrong v. Board of School Directors*, 616 F.2d 305, 310 (7th Cir. 1980)

17  (approving notice published twelve days prior to a scheduled fairness hearing), overruled on other

18  grounds, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *Air Lines Stewards & Stewardesses*

19  *Asso. v. American Airlines Inc.*, 455 F.2d 101, 108 (7th Cir. 1972) (approving a three week

20  notice period); *Grice v. PNC Mortgage Corp. of America*, 1998 WL 350581, * 8 (D. Md. May

21  21, 1998) (giving notice thirty days prior to fairness hearing "permit[ted] the class as a whole 'to

22  flush out whatever objections might reasonably be raised to the settlement'").

23      Here, while some class members received individual notice of the proposed settlement after

24  the deadline to object or request exclusion, most were mailed approximately thirty days prior to

25  the original date set for the fairness hearing. Additionally, the vast majority were sent out more

26  than six weeks before the continued fairness hearing. This gave class members adequate time to

27  to object or request a continuance. See *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 429-

28  30 (5th Cir. 1977) (four weeks between notice and hearing sufficient); *Grunin v. Int'l House of*

1    *Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975) (nineteen days sufficient).

2          As in *Torrisi*, it is significant that only fifty-six of the more than 50,000 individuals who

3    received notice requested exclusion, and that only one objected.  The objector, moreover,

4    misunderstood the manner in which plaintiffs proposed that attorneys' fees be paid.  While

5    plaintiffs received four requests for exclusion after August 29, 2001,[21] no further objections or

6    requests for continuances were received.  Based on all the information before it, the court

7    concludes that the class as a whole received adequate notice of the proposed settlement and

8    fairness hearing to flush out reasonable objections to the proposal.  See *Torrisi, supra*, 8 F.3d at

9    1345.  It thus finds that the notice requirements of Rule 23(e) have been met.

10         **B.     Fairness of Proposed Settlement**

11         "The role of a court . . . reviewing the proposed settlement of a class action under

12   Fed.R.Civ.P. 23(e) is to assure that the procedures followed meet the requirements of the rule and

13   comport with due process and to examine the settlement for fairness and adequacy."  *Vaughns v.*

14   *Board of Educ. of Prince George's County*, 18 F.Supp.2d 569, 578 (D. Md. 1998) (collecting

15   cases).  Where, as here, the settlement involves a class that has not been formally certified, the

16   court must apply an even higher standard of fairness.  *In re Mego Financial Corp. Securities*

17   *Litigation*, 213 F.3d 454, 458 (9th Cir. 2000); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026

18   (9th Cir. 1998).  The district court's role, in reviewing "what is otherwise a private consensual

19   agreement negotiated between the parties to a lawsuit, must be limited to the extent necessary to

20   reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or

21   collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair,

22   reasonable and adequate to all concerned."  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d

23   615, 625 (9th Cir. 1982), cert. denied, 459 U.S. 1217 (1983).  This determination requires:

24         "a balancing of several factors which may include, among others, some or all of

25         the following: the strength of plaintiffs' case; the risk, expense, complexity, and

26         likely duration of further litigation; the risk of maintaining class action status

27   ───────────────────────

28   [21]*Id.*, ¶ 9.

8

1    throughout the trial; the amount offered in settlement; the extent of discovery

2    completed, and the stage of the proceedings; the experience and views of counsel;

3    the presence of a governmental participant; and the reaction of the class members

4    to the proposed settlement." *Torrisi*, *supra*, 8 F.3d at 1375.

5   The degree of importance attached to each factor is determined by the nature of the claim, the

6   type of relief sought and the facts and circumstances of each case. See *Officers for Justice*, *supra*,

7   688 F.2d at 625.

8                           **1.    Strength Of Plaintiffs' Case**

9          A consideration of the risks of establishing liability and damages at trial weighs in favor

10  of finding the proposed settlement is fair.  Essential to plaintiffs' claims is proof that defendants

11  had the requisite scienter in making the allegedly misleading statements or omissions. See *In re*

12  *AnnTaylor Stores Sec. Litig.*, 1993 WL 183732, * 3 (S.D.N.Y. May 25, 1993) (noting the

13  difficulty plaintiffs would face if they proceeded to trial and attempted to prove that defendants

14  knew their forward-looking statements about future profits were false or misleading); *In re Avon*

15  *Products Sec. Litig.*, 1992 WL 349768, * 2 (S.D.N.Y. Nov. 6, 1992) (noting that plaintiffs would

16  be required to establish that statements made "were not only false but were made either with the

17  intention of misleading or with reckless disregard of their truth," the court found that a pretrial

18  settlement was fair and reasonable).   Indeed, the Private Securities Litigation Reform Act

19  ("PSLRA") sets a high bar for actions brought under Rule 10b-5 even at the pleadings stage.  To

20  comply with the statute, plaintiffs must plead "in great detail, facts that constitute strong

21  circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics*

22  *Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (interpreting the (PSLRA)). Moreover, the

23  complaint must "specify each statement alleged to have been misleading, the reason or reasons

24  why the statement is misleading, and, if an allegation regarding the statement or omission is made

25  on information and belief, the complaint shall state with particularity all facts on which that belief

26  is formed." 15 U.S.C. § 78u-4(b)(1).

27         It is highly likely that defendants will file a motion to dismiss plaintiffs' complaint for

28  failure to comply with the PSLRA if the proposed settlement is not approved.  Defendants have

already moved to dismiss a claim filed by shareholders who have opted out of the settlement class, asserting that the complaint does not identity the source of claimants' knowledge regarding the allegedly false or misleading statements, that it does not specify the reason why the statements were misleading, and that it does not plead with sufficient detail facts demonstrating that defendants acted with "deliberate or conscious recklessness."[22] The shareholders' complaint that has been challenged is taken "almost word-for-word from the class action complaint,"[23] and defendants' counsel declares that "[h]ad defendants not reached an acceptable settlement in principle with the class plaintiffs, [they] would have filed a substantially similar motion to dismiss against the amended complaint in the Consolidated Action."[24] For their part, plaintiffs' counsel express doubt as to whether the consolidated complaint would be found to meet the stringent pleading requirements set out in *Silicon Graphics*.[25]

Beyond the stringent requirements of the PSLRA, Rule 10b-5 damages are measured by the difference between the stock purchase price and the true value of the stock on the date of purchase. See *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436-37 (9th Cir.1987). Proving damages here would require that plaintiffs establish what part of the diminution in the market value of eConnect stock was caused by defendants' alleged misrepresentations and omissions as opposed to other market factors. Expert testimony is required to establish what the "fair value" of the stock would have been (*Sirota v. Solitron Devices Inc.*, 673 F.2d 566, 576-78 (2d Cir. 1982)), leading almost invariably to a "battle of experts," with the attendant costs and litigation risks that such a contest entails.

Plaintiffs, in fact, would face a strong argument that a large portion of the inflation in

---

[22]King & Alexander Decl., Ex. 5 (*Belkin v. eConnect, Inc.*, CV 01-06526, Defendants' Notice of Motion and Motion to Dismiss Complaint). This motion is currently pending before Judge Ronald Lew of the Central District of California.

[23]*Id.* at 1:19-20.

[24]King & Alexander Decl., Ex. 4, Declaration of Steven J. Aaronoff, ¶ 4.

[25]King Decl., ¶ 36.

1   eConnect's stock price was caused by opinions offered by Independent Financial Reports ("IFR"),

2   a previously unknown research firm that issued analyst reports regarding eConnect on February

3   29 and March 1, 3, and 8, 2000. IFR ceased operations after its March 8, 2000 report, and the

4   SEC subsequently charged its principal with securities fraud.[26] Based on the data supplied by

5   plaintiffs' damages experts, the issuance of IFR reports coincided with several of the increases

6   in eConnect's stock price.[27] This fact might undermine severely plaintiffs' ability to prove

7   causation.

8           The foregoing weaknesses and/or difficulties in plaintiffs' case weigh in favor of a finding

9   that a settlement equal to 19% of plaintiffs' estimated damages is adequate and fair to the class.

10          **2.       The Risk, Expense, Complexity, And Likely Duration Of Further**

11                      **Litigation**

12          Plaintiffs represent that eConnect has no liability insurance, and that it has had severely

13  limited resources throughout the course of this litigation. They maintain that this significantly

14  affected their view of the litigation and their settlement strategy.[28] Defense counsel confirms that

15  eConnect has no liability insurance.[29] The company's most recent quarterly report filed with the

16  SEC indicates that it has no cash, current assets of $2,601, total assets of $1,941,219, and total

17  current liabilities of $13,541,931.[30] Plaintiffs counsel have reviewed the financial data of the

18  individual defendants as well, on an "attorneys' eyes only basis," and are satisfied that these

19  parties also have little in the way of assets.[31]

20  _____

21          [26]Supp. Nettesheim Decl., ¶ 12.

22          [27]*Id.*, ¶ 11. Nettesheim's estimate of $15 million in damages takes into account the effect

23  of the IFR reports. (*Id.*, ¶ 15.)

24          [28]King Decl., ¶¶ 2, 17.

25          [29]Aaronoff Decl., ¶ 3.

26          [30]King & Alexander Decl., Ex. 3, Econnect Form 10-QSB, Quarterly Report for the

27  Quarterly Period Ended June 30, 2001.

28          [31]King Decl., ¶ 20, n. 2.

1      Plaintiffs assert that the proposed settlement insures the recovery of "the maximum amount

2   reasonably possible while still giving eConnect a chance to survive."[32]  Survival is necessary to

3   permit any recovery, as eConnect's major asset remains its stock, despite its greatly reduced

4   value. The Ninth Circuit implicitly recognized the propriety of considering defendants' financial

5   condition in *Torrisi, supra.*  It noted that the district court had approved the settlement largely

6   because the defendant would otherwise have declared bankruptcy, leaving "little if anything for

7   class members." *Torrisi, supra*, 8 F.3d at 1376 ("Here one factor predominates to make clear that

8   the district court acted within its discretion.   That factor is Tucson's financial condition").  See

9   also *Grish v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (recognizing "the ability of the defendant

10  to withstand a greater judgment" as a factor to be considered in evaluating a proposed class action

11  settlement); *In Re Oracle Securities Litigation*, 829 F. Supp. 1176, 1179 (N.D. Cal. 1993)

12  (because the defendant was able to pay substantially more than the proposed settlement amount,

13  the reasonableness of the settlement turned on the likelihood that plaintiffs could recover more if

14  the case proceeded); *In re U.S. Grant Hotel Assoc. Ltd. Securities Litigation*, 1990 WL 260536,

15  * 5 (S.D. Cal. Nov. 6, 1990) (finding reasonable a settlement in which one defendant contributed

16  a much smaller percentage to the common fund than another, in part on the basis of the

17  defendant's limited insurance coverage).   It is reasonable to consider defendants' ability to

18  withstand a judgment greater than the settlement reached, and to withstand the costs of protracted

19  litigation when evaluating the risk and expense of further litigation.  Given defendants' financial

20  circumstances, this factor weighs strongly in favor of approving the proposed settlement.

21          **3.     The Risk Of Maintaining Class Action Status Throughout Trial**

22      The parties have stipulated to a settlement class of all persons who purchased or otherwise

23  acquired eConnect securities between November 18, 1999 and March 13, 2000.[33]  This class has

24  not been certified by the court.  Continuing the litigation would therefore require that plaintiffs

25  demonstrate class certification is appropriate, with the attendant risk that the class period would

26  _____

27      [32]*Id.*

28      [33]Stipulation of Settlement dated June 1, 200, ¶¶ 1.17-1.19.

1   shrink or class members be excluded.  Particularly as putative class members who bought shares

2   after February 29, 2000 would have to eliminate the IFR reports as the cause of the decrease in

3   stock price, the possibility that the class could shrink is more than theoretical.  This factor thus

4   favors approval of the proposed settlement.

### 4.   The Amount Offered In Settlement

6        As the Ninth Circuit has noted, "it is the very uncertainty of outcome in litigation and

7   avoidance of wasteful and expensive litigation that induce consensual settlements.  The proposed

8   settlement is [thus] not to be judged against a hypothetical or speculative measure of what *might*

9   have been achieved by the negotiators." *Officers for Justice, supra*, 688 F.2d at 625 (emphasis

10  in original).  Rather, "the very essence of a settlement is compromise, 'a yielding of absolutes and

11  an abandoning of highest hopes.'" *Id.* at 624 (citations omitted).  "'The fact that a proposed

12  settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean

13  that the proposed settlement is grossly inadequate and should be disapproved.'" *Linney v.*

14  *Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *City of Detroit v.*

15  *Grinnell Corp.*, 495 F.2d 448, 455, n. 2 (2d Cir. 1974), overruling on other grounds recognized

16  by *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415 (2d Cir. 1989)).

17  Estimations of what constitutes a fair settlement figure are reduced when factors such as the risk

18  of losing at trial, the expense of litigating the case, and the expected delay in recovery (often

19  measured in years) are considered.

20       Given eConnect's financial position, and the weaknesses in plaintiffs' case, the settlement

21  amount appears to be fair and adequate.  As noted, plaintiffs estimate their damages at $15

22  million. The proposed settlement is comprised of a cash payment of $350,000 and issuance of

23  stock warrants valued at $2.5 million plus interest.  The proposed settlement amount thus

24  represents 19% of the estimated damages.

25       Similarly, the allocation of the Settlement Fund between cash and warrants also appears

26  reasonable.  Negotiations regarding the number and terms of the warrants were apparently

27

28

1   extensive.[34]   The warrants represent class members' best chance for recovery, because, as

2   eConnect's quarterly report reflects, it is unlikely that the company could pay substantially more

3   of the settlement in cash. This factor too, therefore, weighs in favor of approving the settlement.

4        **5.   The Stage Of The Proceedings And Extent Of Discovery Completed**

5        No discovery has been conducted in this case. Plaintiffs proceeded without formal

6   discovery in the reasonable belief that any move towards formal discovery would invite the filing

7   of a motion to dismiss by defendants, which would in turn stay discovery pursuant to the PSLRA.

8   15 U.S.C. § 78u-4(b)(3)(B) ("[A]ll discovery and other proceedings shall be stayed during the

9   pendency of any motion to dismiss. . ."). Plaintiffs instead utilized informal investigation,

10   reviewing news articles and press releases disseminated prior to, during, and after the class

11   period, visiting relevant web sites, and reviewing public documents such as SEC filings.[35]

12        The lack of discovery creates some risk that the settlement was negotiated without of

13   sufficient information to evaluate properly the value of plaintiffs' claims. See *In re Washington*

14   *Public Power Supply System Securities Litigation*, 720 F.Supp. 1379, 1392 (D. Ariz. 1989), aff'd.

15   sub nom. *Class Plaintiffs v. Seattle*, 955 F.2d 1268 (9th Cir.), cert. denied, 506 U.S. 953 (1992)

16   (approving a settlement where extensive discovery "provided a comprehensive picture and

17   permitted counsel to evaluate the strengths and weaknesses of the litigation in connection with

18   their contemplation and consummation of these settlements"). One of the intentional effects of

19   the PSLRA, however, was to delay substantial discovery until the pleadings had been tested, and

20   thereby to minimize the cost to defendants of frivolous claims. *Medhekar v. United States Dist.*

21   *Ct. for N.D. Cal.*, 99 F.3d 325, 328 (9th Cir. 1996). This has the unintended effect of preventing

22   information-gathering that could assist in early settlement. While discovery would have

23   strengthened plaintiffs' assertion that they were able to evaluate properly the benefits and risks

24   of proceeding, the court concludes, on balance, that plaintiffs had sufficient information to assess

25   the potential for recovery in this case.

26   

_____

27   [34]King Decl., ¶ 20.

28   [35]King & Alexander Decl., ¶ 15.

### 6.     The Presence Of A Governmental Participant

Concerns regarding the lack of discovery are allayed somewhat by the fact that the SEC initiated parallel proceedings after conducting an extensive investigation.[36] The SEC's complaint and pleadings filed in connection with its requests for temporary restraining order, preliminary injunction and default judgment provided a record plaintiffs could have reviewed, and on which they apparently relied to some extent.[37]

### 7.     The Experience And Views Of Counsel

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) (citations omitted). A Westlaw search reveals that lead counsel have, between them, participated in more than fifty securities class actions, suggesting that they have a high degree of experience in such matters as a group. Their belief that "the Settlement represents the best possible result for the class under the difficult and unfortunate circumstances of this case"[38] weighs in favor of approving the settlement.

### 8.     Class Member's Reaction To The Proposed Settlement

Plaintiffs sent 71,345 notices to individual settlement class members between June 29 and August 29, 2001.[39] In addition, they published a notice regarding the settlement in the *Investor's Business Daily* on July 26, 2001, advising class members of the proposed settlement and the date, time, and location of the fairness hearing, and providing instructions as to how class members could obtain a more detailed notice and a claim form.[40] As of September 4, 2001, plaintiffs' counsel had received only one objection, based on an inaccurate assumption regarding the manner

---

[36]*SEC v. eConnect and Thomas Hughes*, CV 00-2959.

[37]King & Alexander Decl., ¶ 15.

[38]*Id.* at 2:6-9.

[39]Rosenbaum Decl., ¶ 6.

[40]*Id.*, ¶ 8.

in which attorneys' fees would be paid.[41] As of August 29, 2001, only fifty-six class members had requested exclusion from the settlement class.[42] Four requests for exclusion were received after August 29.[43]

The "fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness." *Hanlon, supra*, 150 F.3d at 1027. Here, following notice by first class mail and publication, class members acquiesced in the settlement by a wide margin. This is strong evidence that the settlement is both fair and adequate. There is, moreover, no evidence of collusion or efforts to prevent class members from commenting on the settlement.

"Ultimately, the district court's determination [of fairness and adequacy] is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice, supra*, 688 F.2d at 625 (citation omitted). "[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation." *Id.* While some aspects of the settlement are less than ideal, the combined factors weigh heavily in favor of approval. For the reasons described above, the court finds that the proposed settlement is fair and adequate, and accordingly approves it.

## C.   Plan Of Allocation

"Approval of a plan of allocation of settlement proceeds in a class action under FRCP 23 is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Oracle Securities Litigation*, 1994 WL 502054, * 1 (N.D. Cal. June 18, 1994) (citing *Class Plaintiffs, supra*, 955 F.2d at 1285). "A plan of allocation that reimburses class members based on the extent of their injuries is generally

---

[41]King Decl., ¶ 30. The one objection, filed by Dr. Ted Zdeblick, was apparently predicated on the assumption that attorneys' fees would be awarded out of the cash portion of the settlement. (Plaintiffs Memorandum of Points and Authorities in Support of Motion for Final Approval of Settlement at 2, n. 3.)

[42]Rosenbaum Decl., ¶ 10.

[43]Rosenbaum Decl. II., ¶ *9*

16

1   reasonable." *Id.*

2       Under the proposed plan of allocation, only class members who suffered an overall net loss

3   will be entitled to receive a portion of the Settlement Fund.  Amounts awarded will be based on

4   the price the class member paid for eConnect shares during the settlement period less the amount

5   realized from the sale of shares during the period, *or* the number of shares held on March 13,

6   2000 multiplied by $1.75.  Claims will be paid in full to the extent settlement funds are available.

7   If the net settlement fund is not sufficient to pay all qualifying claims in full, claimants will be

8   paid a proportionate amount based on the total of authorized claims.[44]

9       The plan proposed is fair and reasonable.  Awards will be based on the extent of class

10  members' damage and all who suffered a loss in some amount will be compensated.  Accordingly,

11  The court approves the plan of allocation.

12  **D.    Attorneys' Fees**

13      Counsel have requested attorneys' fees, costs, and expenses from the Settlement Fund to

14  compensate them for their efforts on behalf of the class.  Under the "equitable fund" doctrine,

15  attorneys for the representative plaintiffs in class action litigation may petition the court for

16  compensation from any benefits achieved as a result of their efforts. *Boeing v. Van Gemert*, 444

17  U.S. 472, 478 (1980).  Because of the difficulties of collective action where "no member of the

18  class has a sufficient stake to drive a hard – or any – bargain with the lawyer[, the district court]

19  has to step in and play surrogate client." *In re Continental Illinois Securities Litigation*, 962 F.2d

20  566, 572 (7th Cir. 1992).  "The object in awarding a reasonable attorney's fee . . . is to give the

21  lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one

22  been feasible." *Id.*

23      Here, plaintiffs' counsel seek as attorneys' fees twenty-five percent of the warrant portion

24  of the settlement fund, plus $141,258.50 in expenses.[45]  They thus seek somewhat less than

25  twenty-five percent of the total common fund, as they do not ask that they be awarded a

26

27      [44]King Decl., ¶¶ 39-41.

28      [45]Pls. Amended Proposed Order Awarding Fees and Expenses, ¶ 3.

1    percentage of the $350,000 cash portion of the settlement.[46]

2        "In 'common-fund' cases where the settlement or award creates a large fund for

3    distribution to the class, the district court has discretion to use either a percentage or lodestar

4    method.[47] The percentage method means that the court simply awards the attorneys a percentage

5    of the fund sufficient to provide class counsel with a reasonable fee." *Hanlon, supra*, 150 F.3d

6    at 1029. The lodestar method is particularly useful where nonmonetary relief is involved, as in

7    such cases "there is no way to gauge the net value of the settlement or any percentage thereof."

8    *Id.* at 1029. Here, the monetary value of the settlement is determinable, and the percentage

9    method is properly used in awarding fees. See *In re Oracle Securities Litigation,* 852 F.Supp.

10    1437, 1449, n. 5 (N.D. Cal. 1994) ("Because there were no nonmonetary benefits conferred on

11    upon Oracle by this derivative suit, common fund principles are particularly pertinent").

12        The Ninth Circuit has established twenty-five percent of the common fund as a

13    benchmark for the awarding of attorneys' fees. *Six (6) Mexican Workers v. Arizona Citrus*

14    *Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). "The benchmark percentage should be adjusted,

15    or replaced by a lodestar calculation,[48] when special circumstances indicate that the percentage

16

---

17       [46]Plaintiffs' counsel suggest it is likely that all of the cash portion of the settlement will be
18    used to pay litigation costs, notice and administrative expenses. (King Decl., ¶ 3.)

19       [47]Approving the district court's use of the lodestar method to award fees in a common fund
     case, the Ninth Circuit has explained:

20    "Despite the recent ground swell of support for mandating a percentage-of-the-fund
     approach in common fund cases, . . . we require only that fee awards in common
21    fund cases be reasonable under the circumstances. Accordingly, either the lodestar
     or the percentage-of-the-fund approach 'may, depending upon the circumstances,
22    have its place in determining what would be reasonable compensation for creating
     a common fund.'" See *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990)
23    (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir.
24    1989)).

25       [48]"The lodestar calculation begins with the multiplication of the number of hours
26    reasonably expended by a reasonable hourly rate. The hours expended and the rate should be
    supported by adequate documentation and other evidence; thus, attorneys working on cases where
27    a lodestar may be employed should keep records and time sheets documenting their work and time
28    spent. The resulting figure may be adjusted upward or downward to account for several factors

1   recovery would be either too small or too large in light of the hours devoted to the case or other

2   relevant factors." *Id.* The Ninth Circuit in *Six (6) Mexican Workers* noted that the usual range

3   of common fund fee awards in securities cases is twenty to thirty percent. *Id.* At least one

4   district court has suggested that these percentages are "sticking points," and that deviation

5   upwards or downwards requires "extraordinary justification." *In re Oracle Securities Litigation,*

6   *supra*, 852 F.Supp. at 1451, n. 9. [49]

7       As plaintiffs' counsel have requested less than the twenty-five percent benchmark amount,

8   their application should be granted unless some "relevant factor" renders the request

9   unreasonable. Among the factors courts consider in evaluating attorneys' fees requests are: "(1)

10   the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill

11   requisite to perform the legal service properly, (4) the preclusion of other employment by the

12   attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or

13   contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount

14   involved and the results obtained, (9) the experience, reputation, and ability of the attorneys,

15   (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship

16   with the client, and (12) awards in similar cases." *McGrath v. County of Nevada*, 67 F.3d 248,

17   252 (9th Cir. 1995). While *McGrath* is a lodestar case, the same factors have been used, albeit

18   in a less systematic way, in cases involving an award based on a percentage of the common fund.

19

20   including the quality of the representation, the benefit obtained for the class, the complexity and

21   novelty of the issues presented, and the risk of nonpayment." *Hanlon, supra*, 150 F.3d at 1029
    (citations omitted).

22      [49]The PSLRA states additionally that "[t]otal attorneys' fees and expenses awarded by the

23   court to counsel for plaintiff class shall not exceed a reasonable percentage of the amount of any

24   damages and prejudgment interest actually paid to the class." See 15 U.S.C. § 78u- 4(a)(6); 15
    U.S.C. § 77z-1(a)(6). "This provision is intended to prevent the payment of attorney's fees based

25   on an inflated settlement figure, where a large part of the settlement is later returned to the coffers

26   of the settling defendant because of a low number of claims. Before awarding fees, therefore, the
    Court must determine what portion of the settlement fund will actually be paid to plaintiffs."

27   *Lyons v. Scitex Corp.*, 987 F. Supp. 271, 279 (S.D.N.Y. 1997). Here, it is likely that the total
    settlement fund will not be adequate to pay all of the claims received. There appears to be little

28   chance that a large portion (or indeed any) of the fund will be returned to defendants.

1   See, e.g., *Six (6) Mexican Workers*, *supra*, 904 F.2d at 1311 ("Here the litigation lasted more

2   than 13 years, obtained substantial success, and involved complicated legal and factual issues");

3   *McKenna v. Sears, Roebuck & Co.*, 116 F.3d 1486, 1997 WL 349024, * 1 (9th Cir. June 25,

4   1997) (Unpub. Disp.) ("The magistrate judge found that there was considerable risk involved if

5   the case had gone to trial, that counsel had been effective in negotiating a settlement of vigorously

6   contested issues, that the settlement was unique and benefitted the class members in excess of $25

7   million, and that counsel's efforts had spanned three months of negotiation. The record supports

8   all of these determinations"). The court will thus proceed to examine these factors in order to

9   determine if the fee award requested is reasonable.

10              1.      **Time And Labor Required**

11          Plaintiffs' counsel report that they expended 2,988.66 hours litigating this case, and that,

12   at normal hourly rates, this amounts to an expenditure of $910,749.25.[50] These numbers are

13   deceptive, however, as they include time expended by thirty-five lawyers or law firms who were

14   not appointed Lead Counsel or Co-Lead Counsel in this case. These lawyers or firms account for

15   1614.85 hours, or some fifty-four percent of the total of 2,988.66 hours recorded.[51] The dollar

16   value of the time recorded by these firms is $540,261, or 59.3% of the $910,749.25 total.[52] Lead

17   Counsel and Co-Lead Counsel in the case recorded 1370.31 hours valued at $370,488.25.[53]

18          At the time it appointed co-lead counsel, the court noted that several courts had declined

19   to appoint multiple firms as lead counsel, *inter alia*, because they were concerned that this would

20   lead to duplication of effort and inefficiency. It stated that it would closely scrutinize counsel's

21   fee application to ensure that it had not reflect such inefficiency, and appointed Co-Lead Counsel

22   on the express "understanding that there [would] be no duplication of attorney's services and that

23

24   _____

25   [50]King & Alexander Decl., ¶¶ 26-27.

26   [51]*Id.*, Ex. 6.

27   [52]*Id.*

28   [53]*Id.*

1   the use of co-lead counsel [would] not in any way increase attorney's fees and expenses." *In re*

2   *Oxford Health Plans, Inc. Securities Litigation*, 182 F.R.D. 42, 50 (S.D.N.Y. 1998).[54] See also

3   *Vincelli V. National Home Health Care Corp.*, 112 F.Supp.2d 1309 (M.D. Fla. 2000) ("The

4   potential for duplicative services and the concomitant increase in attorneys' fees work against the

5   approval of more than one law firm, especially in cases in which one law firm has the proven

6   ability to adequately manage and litigate securities class actions").

7        The court certainly did not contemplate that plaintiffs' fee application would be based on

8   time recorded by those firms *not* appointed as co-lead counsel, since the PSLRA established the

9   lead counsel structure not only to ensure that plaintiffs retain control of the litigation, but also to

10  limit the fees ultimately recovered by plaintiffs' class action counsel. See Conf. Rep. 36, 1995

11  U.S. Code Cong. & Admin. News at 735 (noting that plaintiffs' class action lawyers "often

12  receive a disproportionate share of settlement awards"); *In re Tyco International, Ltd. Securities*

13  *Litigation*, 2000 WL 1513772, * 9 (D.N.H. Aug. 17, 2000) ("The PSLRA expressly limits the

14  total fees and expenses that may be awarded to counsel for a plaintiff class to no more than 'a

15  reasonable percentage of the amount of any damages and prejudgment interest actually paid to the

16  class.' 15 U.S.C. § 78u-4(a)(6). . .").

17       With these considerations in mind, the court will not take into account time incurred by

18  counsel other than the three firms it earlier appointed as Co-Lead Counsel in assessing the

19  reasonableness of the percentage award requested. Moreover, it will not award fees to firms other

20  than the Co-Lead Counsel – Weiss & Yourman, Stull, Stull & Brody, and Kaplan, Kilsheimer &

21  Fox. See *In re Oracle Securities Litigation*, *supra*, 1994 WL 502054 at * 2-3 (rejecting the fee

22  application of a firm not appointed Lead Counsel for work done prior to the appointment of Lead

23  Counsel, the court stated: "Pursuant to the court's prior orders, the Lowey Firm has discretion

24  to share the fee award with other counsel who have contributed to the prosecution of the class

25  action. [Lead Counsel's] plan to compensates the Gold Firm for the Gold Firm's pre-appointment

26

27       [54]See Order Granting Plaintiffs' Motion for Consolidation, Appointment of Lead Plaintiffs

28  and Approval of Selection of Lead Counsel at 28.

1   efforts only to the extent those efforts benefitted the prosecution of the litigation is reasonable").[55]

2   The court notes, in this regard, that no firm has provided any information regarding the nature

3   of the services it performed or whether they were provided prior or subsequent to the court's

4   appointment of Co-Lead Counsel.  Given the court's expressed concerns and cautions regarding

5   duplication of work, taking such fees into account in ascertaining a reasonable percentage award

6   would be contrary to the PSLRA's mandate.

7        The lodestar value of the time expended by Lead Counsel and Co-Lead Counsel in this case

8   is approximately 59% of the fees they seek to have awarded, as 25% of the $2.5 million estimated

9   value of the warrant portion of the Settlement Fund is $625,000.  Counsel's request for $625,000

10  is further undercut by the fact that they have provided virtually no information regarding the

11  nature of the services they performed.  It is evident, of course, that they prepared and filed a

12  consolidated class action complaint.  They assert – without detail or quantification – that they

13  conducted "extensive research and investigation" in this regard.[56]  They further suggest – again

14  without detail or quantification – that the settlement they recommend is the product of "substantial

15  and ongoing factual investigation, telephonic meetings among themselves and with their

16  materiality and damages consultant, reviewing thousands of pages of public filings, annual reports

17  and other public statements, including press releases and articles about eConnect, and researching

18  the applicable law. . . ."[57]  Negotiations with defense counsel apparently continued over the

19  course of three months.[58]

20        This litigation did not involve any motion practice or formal discovery proceedings, and

21  negotiation of a settlement began almost immediately after the filing of the consolidated class

22  ────────────────

23  [55]Co-Lead Counsel will have the discretion to share the fee award with these other firms

    if they believe doing so is warranted, i.e., if the work for which counsel are being compensated

24  was of actual benefit to the class as a whole.

25  [56]Plaintiffs' Memorandum in Support of Plaintiffs' Counsel's Application for an Award of

26  Attorneys' Fees and Expenses ("Pls.' Attys. Fees Memo") at 2:7-8.

27  [57]Id. at 4:20-27.

28  [58]King Decl., ¶¶ 2-3.

1    action complaint.  Nonetheless, Lead Counsel represent that they expended 1370.31 hours, the

2    equivalent of having one attorney work 34 40-hour weeks on only this case.  It is difficult to

3    conceive how the tasks counsel state they performed could have consumed this amount of time.

4    The court must conclude, therefore, that a not insignificant amount of duplication resulted from

5    the appointment of three firms as Co-Lead Counsel.

6         For all the reasons discussed, the court finds that the time and labor required to represent

7    plaintiffs weighs against approval of the fee award counsel seek.

8         **2.    Novelty And Difficulty Of The Questions Involved And Skill Required**

9         The difficulty of securities litigation generally - particularly the challenges presented by

10   the pleading requirements of the PSLRA – require skilled counsel familiar with the relevant

11   statutes and case law.  In the instant case, counsel faced special factual challenges in connection

12   with the causation element of the claim.  Thus, the difficulty of the questions presented favors a

13   benchmark award of fees.

14        In addition to the difficulty of the legal and factual issues raised, the court should also

15   consider the quality of opposing counsel as a measure of the skill required to litigate the case

16   successfully.  See *In re Equity Funding Corp. Sec. Litig.*, 438 F.Supp. 1303, 1337 (C.D. Cal.

17   1977); *Wing v. Asarco*, 114 F.3d 986, 989 (9th Cir. 1997) (noting the district court's evaluation

18   of job done "in light of the quality of opposition counsel and [defendant's] record of success in

19   such litigation").  Opposing counsel here was McDermott, Will, and Emery, a major firm with

20   a significant practice defending securities class actions.  Overall, therefore, this factor militates

21   against any significant downward deviation from the benchmark.

22        **3.    Risks, Lost Opportunities, And The Contingent Nature Of Plaintiffs'**

23        **Fees**

24        Although plaintiffs' counsel usually undertake only cases they expect to win, they do, from

25   time to time, accept cases with significant risk of loss or minimal recovery, and invest time and

26   money in their prosecution.  See Charles Yablon, *The Good, the Bad, and the Frivolous Case:*

27   *An Essay on Probability and Rule 11*, 44 U.C.L.A. L. REV. 65 (1996).  As Judge Posner noted

28   in *In re Continental Illinois Securities Litigation*, supra, 962 F.2d at 569, "the failure to make any

23

provision for risk of loss may result in systematic undercompensation of plaintiffs' counsel in a class action case, where . . . the only fee that counsel can obtain is, in the nature of the case, a contingent one." Given the perilous financial condition of eConnect, this litigation carried a special risk than no recovery would be available. This weighs in favor of approving counsel's requested award.

### 4.   Amount Involved And Results Obtained

The amount of recovery is of primary importance in evaluating a request for the approval of attorneys' fees. See *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). As noted above, the settlement fund represents 19% of plaintiff's estimated damages. The court has found that this result was fair and reasonable, given the current state of eConnect's financial affairs and the proof problems that would have been encountered had the action proceeded. Thus, this factor too favors a benchmark award.

### 5.   Experience, Reputation, And Ability Of The Attorneys

The court has reviewed the firm and individual résumés of plaintiffs' counsel, and noted their regular appearance in published and unpublished dispositions of the district courts in connection with securities fraud matters. The court is satisfied that plaintiffs' counsel brought significant expertise to this matter, and that this contributed substantially to the outcome.

### 6.   The 'Undesirability' Of The Case

As explained more fully in connection with the court's evaluation of the strength of plaintiffs' case, this matter involved difficulties in proof that some counsel might have found daunting. On balance, however, the number of cases filed in this matter prior to consolidation indicates that the case would not have been orphaned. This factor, therefore, does not appear to support any deviation from the benchmark figure.[59]

### 7.   Awards In Similar Cases

Awards in the range of 25% of a settlement fund are not uncommon in § 10(b) common

---

[59]Moreover, the Supreme Court has cast doubt on the relevance of the "undesirability" factor in determining whether the amount of attorneys' fees requested is reasonable. *City of Burlington v. Dague*, 505 U.S. 557 (1992).

24

1  fund cases such as this. See, e.g., *Roberts v. Heim*, 1991 WL 427888 (N.D. Cal. Aug. 28, 1991)

2  ("the benchmark for such awards is generally 25% to 30%. . . . According to the Ninth Circuit,

3  attorney fees should generally be between 20% and 30% of the settlement fund, with the bench

4  mark being 25%"); *Bello v. Integrated Resources, Inc.*, 1990 WL 200670, * 3 (S.D.N.Y. 1990)

5  (the common range of fee awards in class action cases is 20-50%); *In re United Energy*

6  *Corporation Solar Power Modules Tax Shelter Investment Securities Litigation*, 1989 WL 73211,

7  * 7 (C.D. Cal. March 9, 1989) (addressing awards in similar cases, the court noted that "[c]lass

8  counsel herein has been awarded 25% recovery in a number of securities-related class actions,

9  primarily within the Ninth Circuit"); *Weseley v. Spear, Leeds & Kellogg*, 711 F.Supp. 713, 718

10  (E.D.N.Y. 1989) (in the Second Circuit, "fees typically range from 15% to 30% of the

11  recovery"); *In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 749-50 (S.D.N.Y. 1985)

12  (awarding approximately 25% of fund and collecting cases, noting that traditionally federal courts

13  have awarded fees in the 20% to 50% range in class actions), aff'd, 798 F.2d 35 (2d Cir. 1986);

14  Moreover, 25% is the benchmark in the Ninth Circuit. See *Powers v. Eichen*, 229 F.3d 1249,

15  1256 (9th Cir. 2000) ("We have also established twenty-five percent of the recovery as a

16  'benchmark' for attorneys' fees calculations under the percentage-of-recovery approach"); *Torrisi*,

17  *supra*, 8 F.3d at 1376 ("In common fund cases such as this, we have established 25% of the

18  common fund as the 'benchmark' award for attorney fees"); *Paul, Johnson, Alston & Hunt v.*

19  *Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) ("The sole remaining issue is what percentage of the

20  common fund would provide PJAH reasonable compensation. The answer to that question, of

21  course, depends on the individual circumstances of this case with which the district court is more

22  familiar than we are. Ordinarily, however, such fee awards range from 20 percent to 30 percent

23  of the fund created. We note with approval that one court has concluded that the 'bench mark'

24  percentage for the fee award should be 25 percent"). Thus, this factor favors approval of

25  counsel's fee request.

26  **8.    Conclusion Regarding Attorneys' Fees**

27     All factors save the amount of time actually expended by Co-Lead Counsel favor approval

28  of the fees they have requested. That factor significantly undercuts the reasonableness of their

1   request, as the information submitted reveals that Co-Lead Counsel recorded time valued at

2   $370,488.25, or 41% less than the $625,000 sought. See *In re Coordinated Pretrial Proceedings*

3   *in Petroleum Products Antitrust Litigation*, 109 F.3d 602, 607 (9th Cir. 1997) ("It is reasonable

4   for the district court to compare the lodestar fee, or sum of lodestar fees, to the 25% benchmark,

5   as one measure of the reasonableness of the attorneys' hours and rates").  The court is also

6   concerned that counsel have not proffered any significant detail regarding the nature of the

7   services they performed, making it difficult, if not impossible, to evaluate the amount of

8   duplication, if any, in the work that was done. For these reasons, it finds it appropriate to reduce

9   the percentage requested to 20% of the warrant portion of the Settlement Fund, the lower end of

10  the range recognized in the Ninth Circuit's cases. See *In re Coordinated Pretrial Proceedings in*

11  *Petroleum Products Antitrust Litigation*, *supra*, 109 F.3d at 607 ("We have said that common

12  fund fees commonly range from 20% to 30% of the fund created. . ."); *Six (6) Mexican Workers*,

13  *supra*, 904 F.2d at 1311. See also *In re Oracle Securities Litigation*, *supra*, 852 F.Supp. at 1451,

14  n. 9 (same).

15      **D.      Expenses And Costs**

16          In addition to fees, plaintiffs' counsel seek reimbursement of costs and expenses totaling

17  $141,258.50 from the $350,000 cash portion of the Settlement Fund.  The district court has

18  discretion to determine an appropriate award of costs and expenses.  See *Trans. Container*

19  *Services v. Security Forwarders, Inc.*, 752 F.2d 483, 488 (9th Cir. 1985).  One court has noted

20  that, in evaluating the reasonableness of costs, "the judge has to step in and play surrogate client."

21  See *In re Continental Illinois Securities Litigation*, *supra*, 962 F.2d at 572.  In keeping with this

22  role, the court must look to prevailing rates and practices in the legal marketplace to assess the

23  reasonableness of the costs sought. *Missouri v. Jenkins*, 491 U.S. 274, 286-87 (1989); *Blum v.*

24  *Stenson*, 465 U.S. 886, 895 (1984).  Cf. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)

25  (statutory fee shifting under § 1988 allows for the recovery of "those out-of-pocket expenses that

26  would normally be charged to a fee paying client").  Both the expenses of Co-Lead Counsel and

27  other class counsel may be considered to the extent they benefitted the overall recovery of the

28  class. See *Waters v. International Precious Metals Corp.*, 190 F.3d 1291, 1298-99 (11th Cir.

1   1999) (affirming a costs award that encompassed amounts expended by lead and other class

2   counsel).

### 1.  Accounting

The court has reviewed the detailed accounting submitted by plaintiffs' counsel, which is summarized below. Unless otherwise noted below, the court finds that the expenses charged were reasonably and necessarily incurred in the course of the litigation.

### a.  Kaplan Fox & Kilsheimer

Kaplan Fox has provided the following accounting of expenses incurred in the course of this litigation:[60]

| | |
|---|---|
| Facsimile | 388.00 |
| Telephone | 285.22 |
| Photocopies (in house) | 10,468.60 |
| Photocopies (outside) | 5,356.43 |
| Air Express/Messengers | 4,291.10 |
| Postage | 5,478.24 |
| Experts-Stanford Consulting | 12,032.00[61] |
| Class Notices | 1,729.89 |
| On-line Research | 577.90 |
| Travel/Meals | 1,174.41[62] |
| Total | 41,781.79 |

Counsel represent that meal reimbursements and local car service were necessitated for all firms claiming such expense given the long hours worked by clerical staff responding to the

---

[60]Supplemental Decl. of Laurence King in Support of Award of Attorneys' Fees and Reimbursement of Expenses ("Supp. King Decl."), Ex. 1.

[61]Jane D. Nettesheim of Stanford Consulting Group, Inc. served as plaintiffs' damages and materiality expert. Stanford's fees and expenses totaled $12,032. (*Id.*, Ex. 38.)

[62]Kaplan Fox has further broken the travel/meals category into $429.77 in food for meetings and meal reimbursements, $500.64 for local car service, and $244.00 for travel in July 2000 to attend the lead plaintiff hearing. (King & Alexander Decl., Ex. 7.)

27

inquiries of thousands of eConnect shareholders when the litigation commenced.[63] The court is aware that this litigation excited substantial shareholder interest, and finds such costs warranted under the circumstances.

### b.    Weiss & Yourman

Weiss & Yourman has provided the following accounting of expenses incurred in the course of this litigation:[64]

| Meals | 1,503.29 |
|---|---|
| On-line Research | 5.48 |
| Filing and Legal Fees | 4,646.28 |
| Messenger, Courier, Federal Express | 2,464.58 |
| Publications | 890.30 |
| Photocopying, Telephone, Postage, Facsimile | 18,968.32 |
| Total | 28,478.25 |

### c.    Stull Stull & Brody

Stull Stull & Brody has provided the following accounting of expenses incurred in the course of this litigation:[65]

| Meals | 526.22 |
|---|---|
| On-line Research | 3158.25 |
| Filing and Legal Fees | 511.46 |
| Messenger, Courier, Federal Express | 125.04 |
| Publications | 1556.66 |
| Photocopying, Telephone, Postage, Facsimile | 50.00 |
| Total | 5927.63 |

---

[63]King & Alexander Decl., ¶ 29.

[64]*Id.*, Ex. 8.

[65]*Id.*, Ex. 9.

### d.   Beatie & Osborn

Beatie & Osborn has provided the following accounting of expenses incurred in the course of this litigation:[66]

| Computer Expense | 231.24 |
|---|---|
| Photocopying, Telephone, Postage, Facsimile | 101.50 |
| Total | 332.74 |

The "computer expense" item appears to be an overhead cost that is not properly awarded out of the common fund. See *In re Mulberry Phosphates, Inc.*, 151 B.R. 948, 951 (M.D. Fla. 1992) (noting that "computer time" was an overhead expense). This amount is accordingly disallowed, and the court awards Beatie & Osborn $101.50.

### e.   Berman DeValerio Pease Tabacco Burt & Pucillo

Berman DeValerio has provided the following accounting of expenses incurred in the course of this litigation:[67]

| Meals | 20.30 |
|---|---|
| Computer Expense | 77.02 |
| Filing and Legal Fees | 320.00 |
| Postage, Messenger, Courier, Federal Express | 368.59 |
| Publications | 1,862.50 |
| Photocopying, Telephone, Facsimile | 626.62 |
| Total | 3275.03 |

Once again, "computer expense," as an overhead item, is not reimbursable. The court thus awards the firm $3,198.01.

### f.   Bernstein Liebhard & Lifshitz

Bernstein Liebhard has provided the following accounting of expenses incurred in the

---

[66]*Id.*, Ex. 4.

[67]*Id.*, Ex. 5.

29

course of this litigation:[68]

| Computer Expense | 516.00 |
|---|---|
| Consultants/Experts | 274.05 |
| Publications | 550.00 |
| Photocopying, Telephone, Postage, Facsimile | 569.74 |
| Total | 1909.79 |

The firm's "computer expense" of $516 is disallowed for the reasons stated above. Similarly, as the nature of the consulting/expert services provided are not explained, and as the class had an adequate damages/materiality expert employed by Lead Counsel, this item too is disallowed. With these amounts deducted, the total expenses awarded are $1,119.74.

### g.    Bull & Lifshitz

Bull & Lifshitz has provided the following accounting of expenses incurred in the course of this litigation:[69]

| Meals | 35.00 |
|---|---|
| Federal Express | 74.23 |
| Filing and Legal Fees | 70.00 |
| Publications | 160.00 |
| Photocopying, Telephone, Postage, Facsimile | 474.32 |
| Total | 813.55 |

### h.    Burt & Pucillo

Burt & Pucillo has provided the following accounting of expenses incurred in the course of this litigation:[70]

| Telephone/Fax | 18.72 |
|---|---|
| Courier/Fed Ex | 64.90 |

---

[68]*Id.*, Ex. 6.

[69]*Id.*, Ex. 7.

[70]*Id.*, Ex. 8.

| Notice | 150.00 |
|---|---|
| Attorney Admission Fees | 170.00 |
| Photocopies/Firm | 146.25 |
| Clerical Overtime | 98.21 |
| Postage | 12.40 |
| Total | 660.48 |

The court must disallow the $98.21 claim for clerical overtime, which is an overhead item and not separately compensable as a litigation expense. See *In re Businessland Securities Litigation*, 1991 WL 427887, * 3 (N.D. Cal. June 14, 1991) ("objectors correctly conclude that secretarial services are overhead and such costs should not be charged as expenses"). When this amount is deducted, the total expenses awarded are $562.27.

### i.    Leo W. Desmond

Desmond has provided the following accounting of expenses incurred in the course of this litigation:[71]

| Computer Expense | 1.05 |
|---|---|
| Photocopying, Telephone, Postage, Facsimile | 87.63 |
| Total | 88.68 |

### j.    David Engler

Engler has provided the following accounting of expenses incurred in the course of this litigation:[72]

| Federal Express | 19.25 |
|---|---|
| Computer Expense | 650.00 |
| Photocopying, Telephone, Postage, Facsimile | 487.00 |
| Total | 1156.25 |

As previously noted, "computer expense" is an overhead item and is not properly awarded

---

[71]*Id.*, Ex. 10.

[72]*Id.*, Ex. 11.

31

1    as a litigation expense. Thus, the total costs awarded Engler are $506.25.

2                    **k.      Faruqi & Faruqi**

3        Faruqi & Faruqi has provided the following accounting of expenses incurred in the course

4    of this litigation:[73]

| Federal Express | 88.00 |
|---|---|
| Messengers | 16.00 |
| Computer | 630.00 |
| Photocopying, Telephone, Postage, Facsimile | 36.00 |
| Publications | 495.00 |
| Total | 1265.00 |

11        Deducting the overhead "computer" expense, the total costs awarded Faruqi & Faruqi are

12   $635.

13                   **l.      Finkelstein & Krinsk**

14       Finkelstein & Krinsk has provided the following accounting of expenses incurred in the

15   course of this litigation:[74]

| Business Wire/Media | 105.00 |
|---|---|
| Experts/Consultants/Investigators | 1,450.00 |
| Filing and Legal Fees | 531.00 |
| Messenger/Courier/Priority Mail | 472.50 |
| Online Research | 17.84 |
| Photocopying | 304.00 |
| Postage | 61.93 |
| Telephone/Facsimile | 184.00 |
| Total | 3126.27 |

24       Because Lead Counsel employed a qualified and experienced consultant, the court

25   disallows the claimed cost for "experts/consultants/investigators." When this amount is deducted,

---

27       [73]*Id.*, Ex. 12.

28       [74]*Id.*, Ex. 13.

1 | the total amount awarded is $1,676.27.

2 |       **m.**    **Gilman & Pastor**

3 |     Gilman & Pastor has provided the following accounting of expenses incurred in the course

4 | of this litigation:[75]

| Federal Express | 72.00 |
|---|---|
| Filing and Legal Fees | 85.00 |
| Computer Expense/Doc. Retrieval | 75.00 |
| Photocopying, Telephone, Postage, Facsimile | 42.18 |
| Total | 274.18 |

    "Computer expense/document retrieval" is an overhead item, and is not properly awarded as a cost in this case.  Consequently, the court awarded Gilman & Pastor a total of $199.18 in costs.

      **n.**    **Girard & Green**

    Girard & Green has provided the following accounting of expenses incurred in the course of this litigation:[76]

| Federal Express | 86.00 |
|---|---|
| Messengers | 80.00 |
| Filing and Legal Fees | 545.50 |
| Computer Expense | 37.21 |
| Photocopying, Telephone, Postage, Facsimile | 499.47 |
| Total | 1248.18 |

    Deducting the overhead expense for computer time, the court awards Girard & Green $1,210.97 in costs.

      **o.**    **Gold Bennett Cera & Sidener**

    Gold Bennett has provided the following accounting of expenses incurred in the course of

---

[75]*Id.*, Ex. 14.

[76]*Id.*, Ex. 15.

33

this litigation:[77]

| Overnight Delivery | 31.40 |
| Computer Expense | 14.54 |
| Photocopying, Telephone, Postage, Facsimile | 151.05 |
| Total | 196.99 |

Deducting $14.54 for "computer expense," the total costs awarded the firm are $182.45.

### p.   Mark Henzel

Henzel has provided the following accounting of expenses incurred in the course of this litigation:[78]

| Phone | 6.74 |
| Postage | 17.30 |
| Copying | 18.50 |
| Faxes | 12.00 |
| Class Notices | 70.00 |
| Total | 124.54 |

### q.   Hoffman & Edelson

Hoffman & Edelson has provided the following accounting of expenses incurred in the course of this litigation:[79]

| Federal Express | 84.00 |
| Computer Expense | 352.00 |
| Publications | 100.00 |
| Photocopying, Telephone, Postage, Facsimile | 112.00 |
| Total | 648.00 |

Deducting $352 for "computer expense," the court awards Hoffman & Edelson $296 in

---

[77]*Id.*, Ex. 16.

[78]*Id.*, Ex. 17.

[79]*Id.*, Ex. 18.

litigation:[99]

| | |
|---|---|
| Photocopies | 388.50 |
| Filing Fees | 783.75 |
| Messenger | 22.00 |
| Telephone | 16.80 |
| Facsimile | 44.00 |
| Postage | 19.55 |
| Research | 6.00 |
| Total | 1280.60 |

## 4. Final Accounting of Allowed Expenses

| | |
|---|---|
| Kaplan Fox & Kilsheimer | 41781.79 |
| Weiss & Yourman | 28478.25 |
| Stull Stull & Brody | 5927.63 |
| Beatie & Osborn | 101.50 |
| Berman DeValerio Pease Tabacco Burt & Pucillo | 3198.01 |
| Bernstein Liebhard & Lifshitz | 1119.74 |
| Bull & Lifshitz | 813.55 |
| Burt & Pucillo | 562.27 |
| Leo W. Desmond | 88.68 |
| David Engler | 506.25 |
| Faruqi & Faruqi | 635.00 |
| Finkelstein Krinsk | 1676.27 |
| Gilman & Pastor | 199.18 |
| Girard & Green | 1210.97 |
| Gold Bennett Cera & Sidener | 182.45 |
| Mark Henzel | 124.56 |
| Hoffman & Edelson | 296.00 |

---

[99]Second Supplemental King Declaration in Support of Award of Attorneys' Fees and Reimbursement of Expenses, Ex. 1.

| | |
|---|---|
| Johnson & Perkinson | 439.88 |
| Kirby McInerney & Squire | 299.60 |
| Levin, Fishbein, Sedran & Berman | 107.14 |
| Morris & Morris | 4006.97 |
| Bruce G. Murphy | 236.20 |
| Tracy J. Murray | 3.00 |
| Pomerantz Haudek Grossman & Green | 8879.42 |
| Rabin & Peckel | 24.96 |
| Savett Frutkin Podell & Ryan | 2254.15 |
| Schiffrin & Barroway | 5365.00 |
| Shoengold & Sporn | 410.40 |
| Seeger Weiss | 6405.46 |
| Shalov Stone & Bonner | 156.56 |
| Lawrence Soicher | 378.84 |
| Robert Strougo | 445.00 |
| Curtis Trinko | 174.17 |
| Wechsler Harwood Halebian & Feffer | 3152.53 |
| Wolf Haldenstein Adler Freeman & Herz | 12100.26 |
| Alfred Yates | 687.19 |
| Lionel Glancy | 1280.60 |
| Total | 133709.43 |

## III. CONCLUSION

For the reasons stated above, the stipulated settlement is approved. The court awards attorneys' fees equal to 20% of the warrant portion of the Settlement Fund. Reimbursement of attorneys' costs in the amount of $130,366.10 is also approved.

DATED: October 22, 2001

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

44

1  costs.

2        **r.**    **Johnson & Perkinson**

3       Johnson & Perkinson has provided the following accounting of expenses incurred in the

4  course of this litigation:[80]

| Federal Express | 28.81 |
|---|---|
| Publications | 95.00 |
| Photocopying, Telephone, Postage, Facsimile | 316.07 |
| Total | 439.88 |

9        **s.**    **Kirby McInerney & Squire**

10      Kirby McInerney has provided the following accounting of expenses incurred in the course

11  of this litigation:[81]

| Notices | 200.00 |
|---|---|
| Photocopying, Telephone, Postage, Facsimile | 96.60 |
| Local Transportation | 3.00 |
| Total | 299.60 |

16        **t.**    **Levin, Fishbein, Sedran & Berman**

17      Levin Fishbein has provided the following accounting of expenses incurred in the course

18  of this litigation:[82]

| Photocopying | 75.00 |
|---|---|
| Postage | 32.14 |
| Clerical Overtime | 8.75 |
| Total | 115.89 |

23      The court disallows the $8.75 claim for clerical overtime, which is overhead and not

24  separately compensable as expenses. When this amount is deducted, the total expenses awarded

---

[80]*Id.*, Ex. 19.

[81]*Id.*, Ex. 20.

[82]*Id.*, Ex. 21.

are $107.14.

### u.     Morris & Morris

Morris & Morris has provided the following accounting of expenses incurred in the course of this litigation:[83]

| Photocopying | 203.75 |
|---|---|
| Facsimile | 1.00 |
| Telephone | 22.86 |
| Court Costs | 170.00 |
| Research | 3539.02 |
| Postage | 70.34 |
| Total | 4,006.97 |

### v.     Bruce G. Murphy

Murphy has provided the following accounting of expenses incurred in the course of this litigation:[84]

| Court Filing Fees | 150.00 |
|---|---|
| Photocopying, Telephone, Postage, Facsimile | 86.20 |
| Total | 236.20 |

### w.     Tracy J. Murray

Murray has provided the following accounting of expenses incurred in the course of this litigation:[85]

| Facsimile | 3.00 |
|---|---|
| Total | 3.00 |

### x.     Pomerantz Haudek Grossman & Green

Pomerantz Haudek has provided the following accounting of expenses incurred in the

---

[83]*Id.*, Ex. 22.

[84]*Id.*, Ex. 23.

[85]*Id.*, Ex. 24.

course of this litigation:[86]

| Overnight mail | 5983.41 |
|---|---|
| Messengers | 28.92 |
| Court Filing Fees | 85.00 |
| Computer Expense | 33.72 |
| Paralegals | 2,240.00 |
| Photocopying, Telephone, Postage, Facsimile | 2,054.36 |
| Publications | 728.00 |
| Total | 11,153.41 |

The "computer expense" item is not reimbursable for the reasons stated above. Additionally, the court must disallow the claimed $2,240.00 for paralegal services. Since courts often adopt a benchmark percentage — e.g., 25% in the Ninth Circuit (see *Paul, Johnson, Alston & Hunt, supra*, 886 F.2d at 272) — there is a strong incentive for counsel to shift as many types of expenses as possible from overhead, which is subsumed within the percentage-of-fund-recovery, to the costs category, so that they may be recovered in addition to the percentage fee. If counsel are permitted to shift paralegal time from the fee category to the cost category, this may encourage the delegation of work to paralegals that should more properly be done by attorneys. Adopting such a practice might also require reevaluation of the appropriate percentage to be applied — that is, require deviating from the benchmark to account for billing practices that differ from those generally accepted in the relevant legal community.

The cases in this district that have addressed the question have determined that paralegal fees should be included in the percentage fee award rather than billed separately as costs. See *In re Quantum Health Resources*, 962 F.Supp. 1254, 1256 (C.D. Cal. 1997) ("Paralegals should be treated as associates or other salaried professionals, with their compensation included in the awarded percentage fee"). In *Morganstein v. Esber*, 768 F.Supp. 725, 726-27 (C.D. Cal. 1991), then-District Judge A. Wallace Tashima concluded: "Paralegals should be treated just like

---

[86]*Id.*, Ex. 25.

37

1  associates or other salaried professionals. Their compensation is included in the percentage fee."

2  *Id.* at 726.

3      The court will follow the rule in this district as reflected by these cases. This is

4  appropriate, since including paralegal time in professional fees is the general practice in this legal

5  community. Additionally, in fixing the appropriate percentage fee award in this case, the court

6  assumed that paralegal time was included, and that it would not be compensated separately as

7  costs. This assumption was derived from certain of the billing summaries presented by counsel,

8  which included paralegal hours in the calculation of total time spent. Were the court to revise that

9  assumption at this juncture, and eliminate paralegal time in evaluating the reasonableness of the

10  percentage fee award, it might be required to reassess the amount of the fee award.

11  Consequently, the court will deduct amounts billed for paralegal time from the claimed costs.

12  With these deductions, the total costs to be awarded are $8,879.42.

13          **y.**   **Rabin & Peckel**

14      Rabin & Peckel has provided the following accounting of expenses incurred in the course

15  of this litigation:[87]

16 / 17

| | |
|---|---|
| Federal Express | 24.96 |
| Total | 24.96 |

18          **z.**   **Savett Frutkin Podell & Ryan**

19      Savett Frutkin has provided the following accounting of expenses incurred in the course

20  of this litigation:[88]

21–25

| | |
|---|---|
| Online Research | 1316.10 |
| Postage | 28.15 |
| Publish Notice | 525.00 |
| Telephone/Facsimile | 53.40 |
| Photocopying | 331.50 |

26  ────────────

27  [87]*Id.*, Ex. 26.

28  [88]*Id.*, Ex. 27.

| Total | 2254.15 |
|-------|---------|

### aa.    Schiffrin & Barroway

Schiffrin & Barroway has provided the following accounting of expenses incurred in the course of this litigation:[89]

| Photocopying | 919.50 |
|--------------|--------|
| Telephone and Facsimile | 111.50 |
| Filings & Service of Process | 170.00 |
| Press Releases | 390.04 |
| Courier, Messengers & Federal Express | 268.04 |
| Postage | 501.38 |
| Online Research | 3004.54 |
| Total | 5365.00 |

### bb.    Schoengold & Sporn

Schoengolf & Sporn has provided the following accounting of expenses incurred in the course of this litigation:[90]

| Federal Express | 60.00 |
|-----------------|-------|
| Online Research | 232.00 |
| Photocopying | 65.90 |
| Postage | 22.00 |
| Telephone, Facsimile | 30.50 |
| Total | 410.40 |

### cc.    Seeger Weiss

Seeger Weiss has provided the following accounting of expenses incurred in the course of this litigation:[91]

---

[89]*Id.*, Ex. 28.

[90]*Id.*, Ex. 29.

[91]*Id.*, Ex. 30.

| Meals, Hotel & Transportation | 246.75 |
| Federal Express | 2,630.76 |
| Publications | 1175.00 |
| Copies, faxes, telephone, postage | 2599.70 |
| Total | 6652.21 |

### dd.   Shalov Stone & Bonner

Shalov Stone has provided the following accounting of expenses incurred in the course of this litigation:[92]

| Notices | 80.00 |
| Photocopying | 30.31 |
| Telephone | 46.25 |
| Total | 156.56 |

### ee.   Lawrence G. Soicher

Soicher  has provided the following accounting of expenses incurred in the course of this litigation:[93]

| Federal Express | 59.00 |
| Court Filing Fees | 85.00 |
| Copies, Faxes, Telephone, Postage | 234.00 |
| Consultants/Experts | 750.00 |
| Total | 1128.84 |

Because Lead Counsel employed a qualified, experienced damages/materiality consultant, the court disallows the expert/consultant expense of $750.  With this amount deducted, the total costs awarded are $378.84.

### ff.   Robert Strougo

Strougo has provided the following accounting of expenses incurred in the course of this

---

[92]*Id.*, Ex. 31.

[93]*Id.*, Ex. 32.

litigation:[94]

| Meals, Hotel & Transportation | 75.00 |
|---|---|
| Federal Express | 55.00 |
| Messengers | 40.00 |
| Computer Expense | 45.00 |
| Publications | 25.00 |
| Copies, Faxes, Telephone, Postage | 250.00 |
| Total | 490.00 |

The "computer expense" item is disallowed as overhead not properly recoverable from the Settlement Fund.   Deducting this item, the total expenses awarded are $445.

### gg.   Curtis V. Trinko

Trinko has provided the following accounting of expenses incurred in the course of this litigation:[95]

| Federal Express | 46.90 |
|---|---|
| Photocopying, Telephone, Postage, Facsimile | 65.67 |
| Online Research | 31.10 |
| Total | 174.17 |

### hh.   Wechsler Harwood Halebian & Feffer

Wechsler Harwood has provided the following accounting of expenses incurred in the course of this litigation:[96]

| Federal Express | 91.40 |
|---|---|
| Photocopying, Telephone, Postage, Facsimile | 1647.13 |
| Publications | 1414.33 |
| Computer Expense | 54.60 |

---

[94] *Id.*, Ex. 33.

[95] *Id.*, Ex. 34.

[96] *Id.*, Ex. 35.

41

| Total | 3207.13 |
|-------|---------|

Deducting the "computer expense" of $54.60, the total costs awarded Weschler Harwood are $3152.53.

### ii.   Wolf Haldenstein Adler Freeman & Herz

Wolf Haldenstein has provided the following accounting of expenses incurred in the course of this litigation:[97]

| Secretarial Overtime | 307.98 |
|----------------------|--------|
| Telephone, Postage, Facsimile | 1453.25 |
| Photocopying | 8290.00 |
| Computer Research/Notice | 702.00 |
| Federal Express, Messenger | 614.71 |
| Filing Fees/Service of Process | 1742.30 |
| Total | 13110.24 |

The court disallows the $307.98 claim for secretarial overtime and $702 item for "computer expense" for the reasons stated above. When these amounts are deducted, the total expenses awarded are $12,100.26.

### jj.   Alfred G. Yates, Jr.

Yates has provided the following accounting of expenses incurred in the course of this litigation:[98]

| Court Filing Fees | 85.00 |
|-------------------|-------|
| Photocopying, Telephone, Postage, Facsimile | 487.19 |
| Publications | 115.00 |
| Total | 687.19 |

### kk.   Lionel Z. Glancy

Glancy has provided the following accounting of expenses incurred in the course of this

---

[97]Supp. King Decl., Ex. 36.

[98]Supp. King Decl., Ex. 37.

42